# In the United States Court of Federal Claims

No. 11-418C
(Filed: May 9, 2016)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
\*
\*
\*
ALAN B. ADAMS,                    \*
\*
              Plaintiff,          \*
\*
      v.                          \*
\*
THE UNITED STATES OF AMERICA,     \*
\*
              Defendant.          \*
\*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Keywords: Judgment on the
Administrative Record; RCFC
52.1(c); 10 U.S.C. § 1201; 10 U.S.C.
§ 1413a; Military Retirement Pay;
Combat-Related Special
Compensation.

*Eugene R. Fidell*, Feldesman Tucker Leifer Fidell LLP, Washington, DC, for Plaintiff.

*Eric Evan Laufgraben*, Civil Division, United States Department of Justice, Washington, DC, for Defendant. With him on the briefs were *Stuart F. Delery*, Assistant Attorney General, *Bryant G. Snee*, Acting Director, *Donald E. Kinner*, Assistant Director, and *Captain Bryce G. Poole*, USAF AFLOA/JACL Litigation Attorney, Military Personnel Branch, Of Counsel.

## OPINION AND ORDER

**Kaplan, Judge.**

This case is before the Court on the parties' cross-motions for judgment on the administrative record. The plaintiff, Alan B. Adams ("Major Adams" or "Plaintiff"), challenges decisions of the Air Force Board of Corrections of Military Records (AFBCMR or "the Board") denying his requests to have his record corrected to reflect that he retired from the Air Force with a disability that was "combat related" within the meaning of 10 U.S.C. § 1413a. Major Adams also challenges the AFBCMR's conclusion that it lacked the authority to order the Defense Finance and Accounting Service (DFAS) to pay him certain additional sums of money to which he claims entitlement as a result of the Board's correction of his records to reflect a sixty percent disability rating.

For the reasons stated below, the government's motion for judgment upon the administrative record is **GRANTED** and Plaintiff's cross-motion is **DENIED**.

**BACKGROUND**

## I.     Statutory and Regulatory Framework

### A.     <u>Statute</u>

This case involves the interpretation and application of 10 U.S.C. § 1413a and its implementing regulations. Pursuant to that statute, certain "combat-related disabled uniformed services retiree[s]" are entitled to elect to receive Combat-Related Special Compensation (CRCS). 10 U.S.C. § 1413a(a).[1] An "eligible combat-related disabled uniformed services retiree" is "a member of the uniformed services who," with exceptions not relevant here, is "entitled to retired pay" and "has a combat-related disability." Id. § 1413a(c). In accordance with section 1413a(e) "the term 'combat-related disability' means a disability that is compensable under the laws administered by the Secretary of Veterans Affairs" and that is either "attributable to an injury for which the member was awarded the Purple Heart" or "was incurred (as determined under criteria prescribed by the Secretary of Defense)" under the following conditions:

> (A) as a direct result of armed conflict;
> (B) while engaged in hazardous service;
> (C) in the performance of duty under conditions simulating war; or
> (D) through an instrumentality of war.

Id. § 1413a(e).

### B.     <u>DoD Implementing Regulations</u>

As noted, the statute authorizes the Secretary of Defense to establish the criteria for determining whether an injury was incurred under one of the four circumstances identified in 10 U.S.C. § 1413a(e)(2). Those criteria are set forth at Attachment 1-1 to an April 27, 2004 Directive Type Memorandum entitled "Revised Guidance on Combat-Related Special Compensation" (hereinafter "Attachment 1-1"), AR at 809–10, and in Department of Defense Instruction (DoDI) 1332.38, entitled "Physical Disability Evaluation," see DoDI § 1332.38 (Nov. 14, 1996).

In accordance with section E3.P5.2.2 of DoDI 1332.38, the "combat-related" standard "covers those injuries and diseases attributable to the special dangers associated with armed conflict or the preparation or training for armed conflict." That section further provides that "[a] physical disability shall be considered combat-related if it makes the member unfit or contributes

---

[1] Under the statute, a retiree with a combat-related disability is entitled to receive an amount equal to or less than his length-of-service retirement pay and his Veterans Administration disability compensation combined. See 10 U.S.C. § 1414(d); see also Department of Defense, <u>Combat-Related Special Compensation</u>, http://militarypay.defense.gov/Portals/107/Documents/ CRSC_Info_Paper_May_08.pdf, last visited May 3, 2016. For tax purposes, a retiree is also entitled to exclude from his gross income any disability payments that he received for combat-related injuries. 26 U.S.C. § 104(b).

to unfitness and was incurred under any of the circumstances listed in paragraphs E3.P5.2.2.1 through E3.P5.2.2.4." DoDI § 1332.38.

### 1. Disabilities Incurred as a Direct Result of Armed Conflict

First, under section E3.P5.2.2.1 of DoDI 1332.38, as well as under Attachment 1-1, physical disabilities are considered combat related if they are incurred "as a direct result of armed conflict." Id.; AR at 809. Section E3.P5.2.2.1 states that "[t]he criteria [for determining whether disabilities are incurred as a direct result of armed conflict] are the same as in paragraph E3.P5.1.2" of the Instruction. The referenced paragraph, E3.P5.1.2, provides as follows:

> The fact that a member may have incurred a disability during a period of war or in an area of armed conflict, or while participating in combat operations is not sufficient to support [a] finding [that the physical disability is a disease or injury incurred in the line of duty as a direct result of armed conflict]. There must be a definite causal relationship between the armed conflict and the resulting unfitting disability.

DoDI § 1332.38; see also Attachment 1-1, AR at 809 (same).

Further guidance on the application of this criterion is set forth in Attachment 1-1. It provides that "[a]rmed conflict includes a war, expedition, occupation of an area or territory, battle, skirmish, raid, invasion, rebellion, insurrection, guerilla action, riot, or any other action in which Service members are engaged with a hostile or belligerent nation, faction, force or terrorists." AR at 809. In addition, according to the Attachment, "[a]rmed conflict may also include such situations as incidents involving a member while interned as a prisoner of war or while detained against his or her will in custody of a hostile or belligerent force or while escaping or attempting to escape from such confinement, prisoner of war, or detained status." Id.

### 2. Disabilities Incurred While Engaged in Hazardous Service

As noted, 10 U.S.C. § 1413a(e)(2)(B) provides that disabilities incurred while engaged in hazardous service are combat related. Pursuant to section E3.P5.2.2.2 of DoDI 1332.38 as well as under Attachment 1-1, "[s]uch service includes, but is not limited to, aerial flight duty, parachute duty, demolition duty, experimental stress duty, and diving duty." DoDI § 1332.38; see also AR at 809. Attachment 1-1 further states that "[a] finding that a disability is the result of such hazardous service requires that the injury or disease be the direct result of actions taken in the performance of such service." AR at 809. "Travel to or from such service, or actions incidental to a normal duty status not considered hazardous are not included." Id.

### 3. Disabilities Incurred Under Conditions Simulating War

Section E3.P5.2.2.3 of DoDI 1332.38, as well as Attachment 1-1, provide criteria for determining whether a disability was incurred under conditions simulating war. They state that, "[i]n general, this covers disabilities resulting from military training, such as war games, practice alerts, tactical exercises, airborne operations, leadership reaction courses; grenade and live fire

weapons practice; bayonet training; hand-to-hand combat training; repelling, and negotiation of
combat confidence and obstacle courses. It does not include physical training activities, such as
calisthenics and jogging or formation running and supervised sport activities." DoDI § 1332.38;
AR at 809.

### 4. Disabilities Incurred Through an Instrumentality of War

Section E3.P5.2.2.4 of DoDI 1332.38, as well as Attachment 1-1, provide criteria for
determining whether a disability was caused by an instrumentality of war. The Instruction states
that:

> Incurrence during a period of war is not required. A favorable determination is
> made if the disability was incurred during any period of service as a result of such
> diverse causes as wounds caused by a military weapon, accidents involving a
> military combat vehicle, injury, or sickness caused by fumes, gases, or explosion
> of military ordnance, vehicles, or material. However, there must be a direct causal
> relationship between the instrumentality of war and the disability. For example, an
> injury resulting from a Service member falling on the deck of a ship while
> participating in a sports activity would not normally be considered an injury caused
> by an instrumentality of war (the ship) since the sports activity and not the ship
> caused the fall. The exception occurs if the operation of the ship caused the fall.

DoDI § 1332.38 at E3.P5.2.2.4.

Attachment 1-1 contains similar language and also explains that:

> An instrumentality of war is a vehicle, vessel, or device designed primarily for
> Military Service and intended for use in such Service at the time of the occurrence
> or injury. It may also include such instrumentalities not designed primarily for
> Military Service if use of or occurrence involving such instrumentality subjects the
> individual to a hazard peculiar to Military Service. Such use or occurrence differs
> from the use or occurrence under similar circumstances in civilian pursuits.

AR at 810.

## II.   Major Adams's Service and Health Problems

Major Adams served as an officer in the United States Air Force from May 31, 1995 until
his honorable discharge on July 1, 2006. AR at 97; Am. Compl. ¶¶ 3–4. Having completed his
required service, Major Adams was separated pursuant to his own January 23, 2006 request. AR
at 79.

As noted by the Board's medical consultant, Dr. Horace Carson, Major Adams's "record
of performance from the start reflects nothing less than a stellar Air Force officer and KC-135
pilot destined for a bright career," which was demonstrated in his performance reports "from day
one until his final evaluation." Id. at 87. Unfortunately, however, Major Adams's career was

ultimately cut short as a result of the continuing effects of an accident that occurred in February of 1997, when he was struck by a car while riding his bicycle. Id. at 16, 33, 68, 87. After the accident, Major Adams experienced chronic neck and back pain. Id. at 16 (observing that as a result of the accident he "required medication and frequent physical therapy to treat increasing low back and neck pain"). Beginning in 2004, as a result of an incident in which he fell in his bathroom, his condition worsened. Id. at 68 (noting that "[f]ollowing the fall, he has had severe weakness of the left upper and left lower extremity with intermittent numbness and paresthesias"). Major Adams still suffers from these disabilities today. See Oral Arg. Tr. 2–3 (counsel explaining that Major Adams may need to stand up periodically during oral argument as a result of back pain).

Despite his reported pain, Major Adams continued to perform as a pilot after receiving a series of medical waivers from his flight surgeon, beginning on October 27, 1999, and renewed on periodic basis, with the last one granted for a three-year period beginning on October 13, 2005. Id. at 87. Major Adams was accordingly not restricted from performing flying duties until May 15, 2006, approximately six weeks before he was discharged. Id. This restriction was imposed "due to his chronic recurrent pain (neck, back, ischial tuberosity area) and inability to sit for extended periods of time (at a desk or in a cockpit)." Id. at 189.

Notwithstanding his continuing pain, Major Adams was not referred to a medical evaluation board before his discharge. See id. at 189 (Board Medical Consultant observing that Major Adams's "reported intolerance to sitting for prolonged periods (flying or otherwise) and the ineffectiveness of conservative treatment measures prior to his discharge should have alerted his health care provider and/or commander to consider an MEB (or a review-in-lieu of an MEB if his condition(s) were believed to have no duty impact); followed by a referral to a Physical Evaluation Board if appropriate"). As noted, Major Adams was honorably discharged at his own request on July 1, 2006. Id. at 97.

## III.   Major Adams's First Request for Correction of His Records

On November 9, 2007, Major Adams submitted an application to the AFBCMR for the correction of his military records to reflect a disability retirement. Id. at 12. In his application, Major Adams sought assistance from the Board "in receiving a medical retirement, recovery of medical expenses and retroactive pay/promotions."[2] Id. He alleged that the Air Force had improperly separated him "with unstable and worsening conditions without a military medical retirement," and that "these problems were directly attributable to [his] aerial flight duty over Iraq and Afghanistan." Id. at 16.[3]

---

[2] Major Adams subsequently withdrew his claim for a promotion. Am. Compl. ¶ 16.

[3] In support of his application, Major Adams submitted a letter summarizing his medical condition and the reasons he believed that he should have been medically retired, AR at 13; a letter from the VA denying his request for vocational rehabilitation and employment services, which stated that he was "not suitable for employment until [he gets his] medical conditions treated," id. at 14; a medical summary that he prepared, id. at 16; letters from his doctors indicating that he suffered from "degenerative back and neck conditions," id. at 17–18; a letter from the VA assigning Major Adams an overall or combined rating of sixty percent for service-

The Air Force Separation Branch, as well the Board's medical consultant, Dr. Carson, initially recommended that Major Adams's request for correction of his military records be denied. Id. at 79–80. In response, Major Adams submitted additional documentation, including a report prepared by Dr. Craig Bash, dated October 7, 2008. Id. at 139–56. In that report, Dr. Bash opined that Major Adams "was clearly not fit for duty, particularly to fly an aircraft, when the Air Force separated him." Id. at 139. He further stated that it was "very clear medically that this patient was very ill prior to his separation from the Air Force and the fact that he was separated and not medically boarded with MEB/PEB process represents a logical disconnect." Id. Dr. Bash concluded that, pursuant to his own review of Major Adams's medical records, Major Adams should be retired with at least a fifty-percent disability rating. Id.

Thereafter, Dr. Carson reconsidered his opinion and recommended that Major Adams receive a disability retirement with a combined disability rating of thirty percent to account for neck, back, and ischial pain. Id. at 188–90. According to Dr. Carson, Major Adams should have received disability ratings of ten percent for his neck pain, ten percent for his back pain, and ten percent for his ischial pain. Id. at 6. Major Adams then submitted a second letter from Dr. Bash, dated May 5, 2009, this time opining that Major Adams's disability should be rated at a minimum of sixty percent. Id. at 200.

## IV.    The Air Force Corrects Major Adams's Military Record to Reflect a Disability Retirement

On April 15, 2010, the AFBCMR issued a decision finding that Major Adams was the victim of an error or injustice and recommending that corrections be made to Major Adams's military record to reflect a disability retirement, with a thirty percent combined disability rating as had been recommended by Dr. Carson. Id. at 8–9. On June 10, 2010, after reviewing the information submitted by Major Adams and consulting with Dr. Carson, the Director of the Air Force Review Boards Agency further modified the recommended relief. As further modified, the record was corrected to show that Major Adams was permanently medically retired, effective July 2, 2006, with a combined disability rating of sixty percent, based on findings of cervical degenerative disc disease, bilateral upper extremity radiculopathy, lumbar intervertebral disc syndrome, and left sciatic nerve neuritis. Id. at 10–11. The corrected record further states "that the degree of impairment was permanent; that the disability was not due to intentional misconduct or willful neglect; that the disability was not incurred during a period of unauthorized absence; and that the disability was not received in the line of duty as a direct result of armed conflict or caused by an instrumentality of war." Id. at 11.

In his June 10, 2010 letter, the Director explained that "[a]fter correction, the records will be reviewed to determine if you are entitled to any monetary benefits as a result of the correction of records." Id. at 1. "This determination," he stated, "is made by [DFAS] and involves the assembly and careful checking of finance records." Id.

---

connected disability compensation for a variety of conditions, id. at 19; an "Injury History and Progression" chart prepared by Major Adams, detailing his a continuing history of back pain, id. at 21; and additional records, id. at 33–77.

**V.      Request for Reconsideration and the Filing of This Suit**

By letter of February 25, 2011, Major Adams sought clarification and/or reconsideration from the Board of several items that were not encompassed in the "final settlement" payment that had been forwarded to him by DFAS in the wake of the Board's decision on his initial claim. Id. at 362. In addition, Major Adams claimed for the first time in his February 25, 2011 letter that he should be entitled to treat his medical retirement pay as tax exempt pursuant to 10 U.S.C. § 1413a because his "disability was received in the line of duty as a direct result of armed conflict or caused by an instrumentality of war." Id. He also demanded that the Board order the following additional relief: (1) immediate TRICARE coverage and coverage retroactive to July 2, 2006; (2) payment of medical and dental bills, including health care insurance premiums; (3) reimbursement in the amount of $1,031.63 for his first move after his retirement. Id.

In his request for reconsideration, Major Adams stated that he would not cash the back-pay check that DFAS had sent to him "until these items are addressed." Id. According to Major Adams, he was concerned that if he cashed the check he would be deemed to have accepted the amount provided in the check in full settlement of his claims. Am. Compl. ¶¶ 21–22. Major Adams similarly did not cash another check in the amount of $5,598 which DFAS issued to reimburse him for past insurance premiums. Id. ¶ 23.

On June 23, 2011, Major Adams filed this suit. ECF No. 1. Thereafter, on August 3, 2011, the case was stayed at Major Adams's request pending the AFBCMR's decision on his request for reconsideration. ECF Nos. 5–6.

**VI.      Board Decisions Rejecting Requests for Reconsideration**

**A.      The First Addendum**

After Major Adams requested reconsideration, Dr. Carson reviewed the records Major Adams submitted to determine whether his disability was "the direct result of armed conflict or was caused by an instrumentality of war." AR at 506; see also id. at 508 (observing that he sought to determine "whether the applicant's clinical presentations represented the expected natural progression of the underlying pathology, likely emanating from his 1997 (and possibly 2004) injuries [or the natural aging process] or whether they could reasonably be considered permanently aggravated by or caused by the applicant's combat flying missions"). Dr. Carson noted that the records before him showed that Major Adams "experienced varying degrees of pain (neck, lower back, and ischial area) during his military service" and that "the evidence shows that pain, particularly in the ischial region and buttocks was 'exacerbated' or flared every time he flew missions." Id. at 509.

Dr. Carson stated that, in his opinion, "an exacerbation of pain upon sitting in the cockpit does not necessarily infer that a permanent worsening of the underlying defect has occurred; in this case the applicant's ischial bursitis . . . and degenerative disc disease." Id. He further noted, however, that "due to the repetitive nature and duration of the applicant's flying missions, which ultimately resulted in permanent disqualification for flying duties, [he] could not rule out a permanent worsening, or aggravation, of his ischial pain over time." Id. at 509–10.

Dr. Carson then turned to a review of the radiographic evidence, which he characterized as insufficient to show that the "underlying defect[s]"—i.e., Major Adams's ischial bursitis and degenerative disc disease—were accelerated by or resulted from his combat flying missions, "as may be implicated in high performance aircraft and the effect of associated sustained high-gravitational forces over a several year period upon the cervical, thoracic, and lumbar spine." Id. at 510. Dr. Carson noted that "[s]everal clinicians have introduced the notion that the applicant's flying duties indeed caused a worsening of one or more of his painful conditions." Id. "However," he stated, "in the absence of a discrete, significant traumatic event productive of biomechanically significant change of anatomic structure, conditions such as degenerative arthritis, degenerative disc disease or chronic mechanical pain, which are also common in the general population," Dr. Carson "found no direct causal relationship between the applicant's underlying medical condition[s] (manifested by acute exacerbations of pain with sitting) and [] combat or an instrumentality of war." Id. (emphasis in original). In short, according to Dr. Carson, "the exacerbation of the applicant's pain incident to assuming a prolonged seated position for extended periods of time, in flight or otherwise, is insufficient to meet the standard of direct causality that his condition was the direct result of combat or the direct result of the Instrumentality of War which [sic] in which he flew." Id.

On April 2, 2012, Major Adams submitted a response to the Board in which he expressed disagreement with Dr. Carson's opinion. Id. at 512–15. Major Adams cited evidence in Dr. Carson's report and the reports of his doctors, both of which he claimed showed that his flight duties had worsened his underlying condition. Id. at 513.

On May 21, 2012, the AFBCMR issued a decision on Major Adams's request for reconsideration in its Addendum to the Record of Proceedings (First Addendum). Id. at 358–61. Without specifying any particular dollar amount that Major Adams was entitled to receive, the Board administratively corrected his military record to reflect that Major Adams should be reimbursed for his first move after his retirement date. Id. at 359. As to his other claims, the Board denied Major Adams's request for reconsideration. Id. at 360.

First, with respect to Major Adams's claim for CRSC, the Board referred to Dr. Carson's comments and his rationale as the basis for its conclusion that Major Adams had not been a victim of an error or injustice. Id. Thus, it cited Dr. Carson's observations: 1) that Major Adams's pain was exacerbated every time he flew missions; 2) that, nonetheless, "an exacerbation of pain upon sitting in the cockpit does not necessarily infer that a permanent worsening of the underlying defect has occurred, such as the applicant's ischial bursitis and degenerative disc disease;" and that 3) "the radiographic evidence alone is insufficient to show that [Major Adams's degenerative disc disease] was accelerated by or resulted from the applicant's combat flying missions." Id. at 359. Further, it observed that Dr. Carson "found no direct causal relationship between the applicant's underlying medical condition(s)" and that he had determined that those conditions "are neither combat-related nor an instrumentality of war" [sic]. Id. at 359–60. Finally, the Board adopted Dr. Carson's rationale that "the exacerbation of the applicant's pain (incident to assuming a prolonged seated position for extended periods of time, in flight or otherwise) is insufficient to meet the standard of direct causality that his condition was a direct result of combat or the direct result of the instrumentality of war in which he flew." Id. at 360.

The AFBCMR further denied Major Adams's continued request for reimbursement of certain expenses and for benefits, ruling again that its power was limited to correcting Major Adams's military records, and reiterating that "[d]etermining the benefits and entitlements that are a consequence of such corrections is the responsibility of TRICARE and [DFAS]." Id. In conclusion, the Board found that "relief beyond that already granted administratively is not warranted." Id.

### B.      The Second Addendum

On June 21, 2012, Major Adams again applied for reconsideration of the Board's decision. Id. at 524–26. Major Adams requested reconsideration on the grounds that the Board did not consider Major Adams's April 2, 2012 submissions in making its decision; that the April 2, 2012 submissions and his medical and combat deployment records supported his claim that his injuries were combat related; and that he was having difficulty obtaining reimbursement and other benefits from DFAS and/or TRICARE. Id. at 525. He also noted that he had yet to receive the reimbursement for his first move after retirement, which the Board had ordered in the First Addendum. Id. at 524. Major Adams also submitted additional documents, including a chronology of events regarding back surgery that he underwent in Germany after his discharge on the recommendation of his doctor and at his own expense, see id. at 527, and emails reflecting his efforts to receive medical and dental benefits, id. at 545–57.

In light of the additional documentation provided by Major Adams, the AFBCMR requested that Dr. Carson reconsider his opinion. Id. at 504. Although Dr. Carson reviewed the additional documentation provided by Major Adams, he "determined another medical opinion was not necessary and indicated that he stood by his original recommendation and had nothing further to add." Id.

Accordingly, on December 28, 2012, the AFBCMR issued its Second Addendum to the Record of Proceedings (Second Addendum) denying Major Adams's second request for reconsideration. Id. at 502–05. With respect to Major Adams's claim that his disability was combat related, the Second Addendum affirmed the Board's prior conclusion that the medical evidence did not establish "a clear linkage between his existing conditions and a combat-related injury." Id. at 504. With respect to Major Adams's request for reconsideration of his claims "for reimbursement of his medical/dental bills and health insurance premiums," the AFBCMR stated that "while every effort is made to make an applicant whole when it is determined that he has been the victim of an error or injustice, we believe the relief previously provided by the Board, to include granting him a medical retirement with TRICARE eligibility constitutes full and fitting relief." Id.

### C.      The Third Addendum

On January 23, 2013, Major Adams requested reconsideration by the Board for the third time, primarily to seek a modification of its decision that he must seek any relief concerning reimbursements or benefits from DFAS or TRICARE. Am. Compl. ¶ 30. The AFBCMR issued a decision finding that Major Adams's request did not meet the criteria for reconsideration by the Board. Id. ¶ 31. After receiving this decision, Major Adams moved this Court to remand the case

back to the AFBCMR, directing the Board to address the issues raised in his January 23, 2013 request for reconsideration. ECF No. 32. On May 6, 2013, the Court granted Major Adams's motion and remanded the case to the AFBCMR for further development of the administrative record. ECF No. 35.

In accordance with the Court's Order, on August 1, 2013, the AFBCMR considered the points raised in Major Adams's January 23, 2013 letter and issued a Third Addendum to its Record of Proceedings (Third Addendum). AR at 559–63. In the Third Addendum, the Board reaffirmed its prior determination that Major Adams had already received all of the relief that the Board is authorized by statute to provide and clarified certain prior points made in the First Addendum and Second Addendum to the extent that they were unclear. Id. at 561. It explained as follows:

> [T]he Board cannot enter an order to direct TRICARE (or DFAS for that matter) to pay the applicant a specific amount. The Board is a creature of statute. Under Title 10, Section 1552, the Board is empowered only to correct military records for the removal of error or injustice. The Board has no authority to issue orders to enforce its own corrections. On the other hand, Section 1552(a)(4) of Title 10 states, "[e]xcept when procured by fraud, a correction under this section is final and conclusive on all officers of the United States." So, to the extent the Board has already granted relief to the applicant, other federal agencies have a duty to provide that relief.

Id. at 562.

Pursuant to the Court's remand order, the AFBCMR also evaluated its previous finding that "there was insufficient evidence to warrant corrective action in regard to the applicant's request that his injuries be rated as combat-related." Id. at 561–62. The AFBCMR found that Major Adams "has not provided any additional information" or evidence "to specifically substantiate his entitlement to the requested relief or to overturn [the Board's] earlier decision." Id. at 562. Given these circumstances, the Board again concluded that there was "no basis upon which to recommend" correcting Major Adams's record to show that his medical condition was combat related. Id. Major Adams's subsequent motion in Court to remand the case to the AFBCMR for further consideration was denied on October 7, 2013. ECF No. 40.

**D.   The Fourth Addendum**

On January 16, 2015, after briefing on cross-motions for judgment on the administrative record was complete and oral argument was scheduled, the government filed a consent motion to remand the matter back to the Board yet again. ECF No. 72. The remand was requested to allow the Board to obtain an advisory opinion from the Director of Compensation, Office of the Deputy Under Secretary of Defense (Military Personnel Policy) (hereinafter ODUSD) as provided in Department of Defense Directive 1332.41 ¶ 3.3 for cases involving combat-related special compensation. Id. The Court granted the government's consent motion. ECF No. 73.

Because the Air Force Personnel Center (AFPC) is the Air Force's office of primary responsibility regarding claims for combat-related special compensation, the Board initiated its request for an advisory opinion through the AFPC. After noting that Major Adams had not previously submitted an application for combat-related special compensation, the AFPC directed the Board to request that Major Adams submit such an application, which he did on February 21, 2015, along with a detailed memorandum for the ODUSD. AR at 765–85.

AFPC's Combat-Related Special Compensation Board (CRSC Board) then conducted a review of Major Adams's application and, on April 15, 2015, determined that Major Adams was entitled to combat-related special compensation for tinnitus and fibromyalgia at a rating of ten percent, but was not entitled to such compensation for the disabilities reflected in his corrected military record. Id. at 786–91.

The CRSC Board explained its conclusion as follows:

> To be approvable for compensation, clear documentation must be provided to indicate that an injury/disability occurred and/or was caused by a specific combat-related factor rather than from routine causes or your particular physical make-up. Your claim and documentation received contained no definitive evidence to confirm these disabilities were the direct result of a combat-related event. Additionally, the fact that a member incurred a disability in an area of armed conflict or while participating in combat operations is not sufficient by itself to support a combat related determination. There must be a definite, documented, causal relationship between the armed conflict and the resulting disability. After reviewing your documentation we were unable to identify a combat-related event as the cause of your disabilities.

Id. at 787.

The CRSC Board's determination, Major Adams's application and memorandum, along with the entire record of proceedings, were then transmitted to the ODUSD for an advisory opinion concerning Major Adams's claim. On June 1, 2015, the ODUSD provided the Board and Major Adams with an advisory opinion. Id. at 814. In the opinion, ODUSD stated that it conducted a review of the case using the guidance found in the DTM dated April 27, 2004 and in the Supplemental Guidance on Combat-Related Special Compensation, dated June 3, 2008. Id. at 814. Based on its review, the ODUSD advised the Board of its view that Major Adams's disabilities (other than tinnitus and fibromyalgia) were not combat related within the meaning of 10 U.S.C. § 1413a. Rather, the ODUSD concluded, "[t]he evidence shows that the applicant's other health issues were incurred as a result of being hit by a car while riding a bicycle in 1997 and falling in a bathroom in 2004." Id. Although the ODUSD observed that Major Adams's medical condition appeared to have deteriorated over time, it opined that the evidence did not show that these issues "were incurred while engaged in hazardous service, in the performance of duty under conditions simulating war, or through an instrumentality of war." Id. at 815. "In addition," the ODUSD noted, "the evidence does not show that the applicant's other health issues were incurred as a direct result of armed conflict." Id. It concluded that "[t]he fact that the

11

applicant deployed numerous times and flew numerous missions does not demonstrate that his other health issues were incurred in the requisite manner to qualify for CRSC benefits." Id.

Major Adams was provided with a copy of the advisory opinion and submitted a response to the Board on June 9, 2015. Id. at 821. On September 8, 2015, the Board issued a decision in which it affirmed its earlier determination declining to correct Major Adams's records to show that his degenerative disc disease of the cervical spine, cervical radiculopathy of the left upper extremity, thoracolumbar sprain, bilateral ischial tuberosity/bursitis, and radiculopathy involving the left lower extremity were combat related. Id. at 623–31. The Board also affirmed the partial relief provided by the CRSC Board, which granted Major Adams a ten percent combat disability rating for fibromyalgia and tinnitus. Id. at 631.

## DISCUSSION

### I.    Jurisdiction of the Court

The Tucker Act empowers this court to hear "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012). While the Tucker Act waives the sovereign immunity of the United States to allow a suit for money damages, United States v. Mitchell, 463 U.S. 206, 212 (1983), it does not confer any substantive rights on a plaintiff. United States v. Testan, 424 U.S. 392, 398 (1976). Therefore, a plaintiff seeking to invoke the court's Tucker Act jurisdiction must identify an independent source of a substantive right to money damages from the United States arising out of a contract, statute, regulation, or constitutional provision. Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008).

A statute may serve as an independent source of a substantive right to money damages where it "'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" Roberts v. United States, 745 F.3d 1158, 1162 (Fed. Cir. 2014) (quoting United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003)). In that regard, "[i]t is enough 'that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages.'" Id. (quoting White Mountain Apache Tribe, 537 U.S. at 473).

It is well established that Section 1201 of title 10 of the United States Code, which governs military disability retirement, is a money-mandating statute because the Secretary of Defense "has no discretion whether to pay out retirement funds once a disability is found qualifying." Fisher v. United States, 402 F.3d 1167, 1174 (Fed. Cir. 2005) (citing Sawyer v. United States, 930 F.2d 1577 (Fed. Cir. 1991)). The same lack of discretion exists under 10 U.S.C. § 1413a, which provides that "[t]he Secretary concerned shall pay to each eligible combat-related disabled uniformed services retiree who elects benefits under this section a monthly amount for the combat-related disability of the retiree determined under subsection (b)." Accordingly, 10 U.S.C. § 1413a is a money mandating statute and this Court has jurisdiction to hear Major Adams's claim that the AFBCMR erred when it found that he was not entitled to combat-related special compensation.

## II.     Standard of Review for Motion for Judgment on the Administrative Record

RCFC 52.1 governs motions for judgment on the administrative record. See RCFC
52.1(c). Therefore, the standard of review for a motion for judgment on the administrative record
differs from that for a motion for summary judgment. Bannum, Inc. v. United States, 404 F.3d
1346, 1354–55 (Fed. Cir. 2005). Unlike summary judgment, for instance, "a genuine dispute of
material fact does not preclude a judgment on the administrative record." Sierra Nevada Corp. v.
United States, 107 Fed. Cl. 735, 751 (2012) (citing Bannum, Inc., 404 F.3d at 1355–56). To the
contrary, "[t]o review a motion or cross-motions under RCFC 52.1(c), the court asks whether,
given all the disputed and undisputed facts, a party has met its burden of proof based on the
evidence in the record." Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 630 (2014)
(citing Bannum, Inc., 404 F.3d at 1356–57; see also RCFC 52.1 Rules Committee Note (2006)
("Summary judgment standards are not pertinent to judicial review upon an administrative
record."). "The existence of a question of fact thus neither precludes the granting of a motion for
judgment on the administrative record nor requires this court to conduct a full blown evidentiary
proceeding." CRAssociates, Inc. v. United States, 102 Fed. Cl. 698, 710 (2011) (citing, inter alia,
Bannum, Inc., 404 F.3d at 1356).

## III.    Scope of Review of Military Correction Board Decisions

The scope of judicial review of military correction board decisions is a narrow one. Thus,
this Court is "'limited to determining whether a decision of the Correction Board is arbitrary,
capricious, unsupported by substantial evidence, or contrary to applicable statutes and
regulations.'" Melendez Camilo v. United States, 642 F.3d 1040, 1044 (Fed. Cir. 2011) (quoting
Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983)). The arbitrary and capricious
standard of review "does not require a reweighing of the evidence, but a determination whether
the conclusion being reviewed is supported by substantial evidence." Heisig, 719 F.2d at 1157
(emphasis in original). "Substantial evidence" is "such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401
(1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). The court is limited
to a review of the record that was before the corrections board. Metz v. United States, 466 F.3d
991, 998 (Fed. Cir. 2006); see also Walls v. United States, 582 F.3d 1358, 1368 (Fed. Cir. 2009).
Finally, it may not "substitute [its] judgment for that of the military departments when
reasonable minds could reach differing conclusions on the same evidence." Heisig, 719 F.2d at
1156.

## IV.     Merits

### A.     Board's Conclusion that Major Adams's Disability Was Not Combat-Related

As explained above, Major Adams's corrected records reflect that, at the time he was
separated, he was unfit to perform the duties of his position as a result of the combination of
several disabling conditions: cervical degenerative disc disease, associated with bilateral upper
extremity radiculopathy; lumbar intervertebral disc syndrome; and left sciatic nerve neuritis. AR
at 11. It is undisputed that all of these conditions originated from causes unrelated to combat. See
id. at 139 (report of Plaintiff's expert, Dr. Craig Bash, observing that "[a]ll of [Major Adams's]
medical problems stem from the primary and secondary complications of his in-service bicycle

accident"); id. at 152 (Dr. Bash noting that "[b]eginning after a car hit him while riding his bike to work, degenerative cervical and lumbar degenerative conditions progressed and increasingly impaired his ability to perform his flying duties culminating in permanent disqualification by the Air Force and medical denial of FAA flying privileges"). It is also undisputed that the pain Major Adams suffered as a result of these conditions was exacerbated during and after his combat flight duty. Id. at 152 (Dr. Bash opining that "[e]xtended sitting while flying in combat deployments worsened his symptoms of radiculopathy").

In finding that Major Adams had failed to establish that his disability was combat related, the Board relied upon Dr. Carson's opinion that "an exacerbation of pain upon sitting in the cockpit does not necessarily infer that a permanent worsening of the underlying defect has occurred, such as the applicant's ischial bursitis and degenerative disc disease," and that "the radiographic evidence alone is insufficient to show that [Major Adams's degenerative disc disease] was accelerated by or resulted from the applicant's combat flying missions." Id. at 359. For the reasons set forth below, the Court concludes that the Board did not act unreasonably in relying upon the opinion of its medical consultant, and that its decision finding that Major Adams's disability was not combat related was neither arbitrary, capricious, nor contrary to law.

As described above, the statute and the relevant provisions of DoDI 1332.38 specify that "a physical disability shall be considered combat-related if it makes the member unfit or contributes to unfitness and was incurred . . . . [w]hile engaged in hazardous service," including while engaged in "aerial flight duty." DoDI 1332.38 §§ E3.P5.2.2, E3.P5.2.2.2; see also 10 U.S.C. § 1413a(e). Attachment 1-1 further specifies that "[a] finding that a disability is a result of such hazardous service requires that the injury or disease be the direct result of actions taken in performance of such service." AR at 809.

In this case, as noted, it is undisputed that Major Adams was not fit for duty at the time of his discharge. The Board found, however, that the underlying conditions/disabilities that caused or contributed to his unfitness were not "incurred" as a result of Major Adams's flight duty. Instead, the Board concluded that the medical conditions that caused Major Adams's pain and discomfort were incurred years earlier as a result of the bicycle accident that took place in 1997. See AR at 623–31.

The Board's conclusion in this regard was supported by substantial evidence and, in fact, as noted above, Major Adams does not dispute that his underlying conditions were not combat related. Thus, the real point of contention between the parties is not whether Major Adams's underlying medical conditions were caused in the first instance by his flight duties. Rather, the issue before the Court is whether substantial evidence supports the Board's decision that Major Adams's flight duties did not aggravate his non-combat-related medical conditions.[4]

---

[4] After oral argument in this case, this Court requested briefing on a subsidiary question: whether, as a matter of law, the aggravation of a pre-existing non-combat-related condition can serve as the basis for an award of combat-related special compensation, given that 10 U.S.C. § 1413a(e) speaks in terms of disabilities "incurred" as a result of combat, as opposed to disabilities "incurred or aggravated" as a result of combat. ECF No. 89; cf. 38 U.S.C. § 101(16) (defining "service-connected" for purposes of Title 38 as meaning, "with respect to disability or

In his March 5, 2012 opinion, Dr. Carson observed that Major Adams experienced varying degrees of neck, low back, and ischial area (lower and back part of the hip bone) pain during his military service, and that such pain was "exacerbated" or "flared-up" when Major Adams flew missions. Id. at 509. Dr. Carson considered whether these flare-ups represented the "expected natural progression of the underlying pathology [a 1997 bike accident and/or a 2004 fall in his bathroom]" or whether they could be "reasonably considered permanently aggravated by or caused by the applicant's combat flying missions." Id. at 508.

Having reviewed the medical evidence, Dr. Carson stated that he was "of the opinion that an exacerbation of pain upon sitting in the cockpit does not necessarily infer . . . a permanent worsening of the underlying defect." Id. at 509. Effectively, Dr. Carson determined that Major Adams's back pain when seated in the cockpit represented the expected, natural consequences of the injury that Major Adams sustained in his 1997 bicycle accident, and perhaps his fall in the bathroom in 2004—neither of which was combat related. Id. at 508. Dr. Carson found that there was insufficient medical evidence to show that Major Adams's underlying disability was "accelerated by or resulted from [his] flying missions." Id. at 359; see also id. at 510. Moreover, Dr. Carson considered the possibility suggested by several of Major Adams's doctors that Major Adams's flying duties caused a worsening of one or more of his painful conditions, but found that "in the absence of a discrete, significant traumatic event productive of biomechanically significant change of anatomic structure," there was insufficient evidence to establish a "direct

---

death, that such disability was incurred or aggravated, or that the death resulted from a disability incurred or aggravated, in line of duty in the active military, naval, or air service"). Major Adams took the position that the concept of "aggravation" of a pre-existing disability was encompassed within the word "incurred." Pl.'s Suppl. Br. at 2–8, ECF No. 92. The government, however, argued that DoD's regulations foreclose a finding of eligibility based on the aggravation of a non-combat-related disability because they require direct causation between a service member's disability and one of the circumstances set forth in 10 U.S.C. § 1413a(e)(2). Def.'s Corrected Suppl. Br. at 2–12, ECF No. 103.

The Court notes that the government's position in this litigation appears inconsistent with the views of the Board itself, which seems to have assumed that the aggravation of a pre-existing disability as a result of combat would be sufficient to support eligibility for CRSC. AR at 359 (noting Dr. Carson's observation that exacerbation of pain does not necessarily imply that there has been "a permanent worsening of the underlying defect"). The Court is also skeptical of the government's argument that there is an inconsistency between the direct causation requirement in the DoD instructions and guidance, and the notion that the aggravation of a disability as a direct result of combat constitutes a combat-related disability. But in any event, the Court need not resolve the legal question of whether the aggravation of a non-combat-related disability meets the statutory and regulatory standards given its conclusion, set forth below, that the Board's decision that Major Adams failed to prove that his disability was aggravated by his flight duties was supported by substantial evidence.

causal relationship between [Major Adams's] underlying condition[s] (manifested by acute exacerbations of pain with sitting) and [e]ither combat or an instrumentality of war." Id. at 510.[5]

Major Adams contends nonetheless that his disabilities should be considered combat-related because the medical records showed (and Dr. Carson concurred) that Major Adams experienced an "exacerbation" of pain during and after flying. Pl.'s Resp. and Cross-Mot. for J. on the Admin. R. (Pl.'s Cross-Mot.) at 28, ECF No. 58. He argues that "exacerbation is obviously within the scope of the 'contributes to' clause of the regulation." Id. Further, Major Adams contends, the AFBCMR (and Dr. Carson) misread the statute by assuming that he was required to prove a causal relationship between his disability and the hazardous service he performed. He distinguishes the provision of the statute upon which he relies, covering disabilities incurred "while engaged in hazardous service," 10 U.S.C. § 1413a(e)(2)(B), from the statutory provision stating that a physical disability is combat-related if it was incurred "[a]s a direct result of armed conflict," 10 U.S.C. § 1414a(e)(2)(A). Id. at 27. These contentions are unpersuasive.

First, there is no merit to Major Adams's contention that he has met the statutory criteria for establishing the existence of a combat-related disability because an exacerbation of pain resulting from his flight duty contributed to his unfitness. Pl.'s Cross-Mot. at 26 (observing that the "only question" concerning his entitlement to CRSC is whether his flight duty "either made him unfit or contributed to his unfitness"); see also id. at 28. This contention conflates two separate inquiries. The question is not—as Major Adams contends—whether his flight duty contributed to his unfitness. It is whether he 1) had a disability that he incurred while engaged in service as a pilot, and 2) whether that disability contributed to his unfitness. As described above, substantial evidence supports the Board's conclusion that Major Adams failed to satisfy the first of these criteria because his underlying disabling condition was incurred as a result of a bicycle accident and because that condition itself was not aggravated by his flight duty.

Critically, there is a legally recognized distinction between the exacerbation of pain caused by the requirement that Major Adams sit for extended periods of time in the cockpit and the aggravation or increase of his underlying disability as a result of his confinement to the cockpit. See Davis v. Principi, 276 F.3d 1341, 1346–47 (Fed. Cir. 2002) (holding that "evidence of temporary flare-ups symptomatic of an underlying preexisting condition, alone, is not sufficient . . . to show increased disability under 38 U.S.C. § 1153 [defining "aggravation" of a disability under veterans benefits statute for purposes of determining whether a disability is service-connected] unless the underlying condition is worsened"). Thus, proof that Major Adams's flying duties caused an exacerbation or flare-up of his symptoms (i.e., pain when sitting for prolonged periods of time) is not enough to establish that his underlying disability was aggravated (i.e., increased) as a result of his time in the cockpit.

---

[5] The Court takes Dr. Carson's reference to the absence of a nexus between Major Adams's underlying medical conditions and "combat or an instrumentality of war" to encompass as conclusion that there was no nexus between his underlying medical conditions and the "hazardous service" in which Major Adams was engaged, namely, his aerial flight duties.

Finally, Major Adams's argument that the statute does not require a causal relationship between a service member's hazardous service and his disability is inherently implausible. The entire purpose of CRSC is to provide service members who incur their disability as a result of combat with benefits above and beyond those which they would receive in any event for other service-connected disabilities. And it seems inconsistent with that statutory purpose to suppose that Congress would have intended a service member to receive enhanced benefits for disabilities that were not the direct result of actions taken in conditions of combat set forth in the statute.

Indeed, Major Adams's argument is inconsistent with the instructions and guidance issued by the Secretary of Defense, to whom Congress delegated the authority to prescribe criteria for determining whether a disability has been "incurred" under one of the four conditions set forth in 10 U.S.C. § 1413a(e)(2). Attachment 1-1 to the DTM, as well as section E3.P5.2.2.2 of DoDI 1332.38, provide that "[a] finding that a disability is the result of . . . hazardous service requires that the injury or disease be the direct result of actions taken in the performance of such service." AR at 809; DoDI 1332.38.

As described above, the scope of this Court's review of the Board's decision regarding whether Major Adams's disability was combat related is a narrow one. The Federal Circuit has held that a service member "who has sought relief from a correction board is bound by its decision unless he can demonstrate by 'cogent and clearly convincing evidence that the correction board acted arbitrarily, capriciously, contrary to law, or that its determination was unsupported by substantial evidence.'" Dodson v. U.S. Gov't, Dep't of Army, 988 F.2d 1199, 1204–05 (Fed. Cir. 1993) (quoting Arens v. United States, 969 F.2d 1034, 1037 (Fed. Cir. 1992)). Further, questions of medical causation are uniquely within the competence of medical professionals. Here, the Board relied upon the opinion of its consulting physician, Dr. Carson, when it concluded that Major Adams's conditions were not incurred (i.e., acquired or aggravated) as a result of his flight duty, even if the symptoms of those conditions were exacerbated by such flight duty. Its reliance was not unreasonable. The Court, therefore, must affirm the Board's ruling denying Major Adams's request for combat-related special compensation.

**B.    The AFBCMR's Determination That It Was Not Authorized to Provide Major Adams With Additional Relief Beyond the Correction of His Records**

Major Adams next contends that the requirement that the Board grant "full and fitting relief" or "thorough and fitting relief," empowers it to issue an order to TRICARE and DFAS to afford Major Adams certain additional monetary relief he seeks. See Pl.'s Cross-Mot. at 29. Specifically, he contends that as a member on active duty he was entitled to receive medical and dental care in any facility of any uniformed service, but that he was denied this right "because he was separated in 2006 rather than taken into the DES and afforded the disability retirement the AFBCMR granted him retroactively in 2010." Id. (citing 10 U.S.C. § 1074(a)(1)–(2)(A)). Therefore, Major Adams argues, the Board should have ordered reimbursement of out-of-pocket expenses he incurred to pay for back surgery, dental work, medications, and private insurance. Id. He challenges the AFBCMR's conclusion that it lacked the authority to "direct DFAS, TRICARE and/or Delta Dental to pay [him] the sums he has claimed." Am. Compl. ¶ 47.

Major Adams's contentions lack merit. First, the Board's authority is, in fact, limited to directing the correction of a service member's records. See 10 U.S.C. § 1552(a)(1) ("The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice . . . . [S]uch corrections shall be made by the Secretary acting through boards of civilians of the executive part of that military department.); see also 32 C.F.R. §§ 865.1, et seq. (detailing the function and responsibilities of the AFBCMR). And once the Board has corrected a record, other agencies have a duty to provide the monetary and other relief due to a service member in light of the corrected record. 10 U.S.C. § 1552(a)(4) ("Except when procured by fraud, a correction under this section is final and conclusive on all officers of the United States."). Thus, DFAS is charged with the resolution of "claims on the basis of the corrected military record" and "[c]omputation of the amount due, if any [based on a Board decision], is a function of DFAS." 32 C.F.R. § 865.7(b)(2).

In this case, in response to the AFBCMR's correction of Major Adams's record, DFAS has sent him the back retirement pay he was due. Am. Compl. ¶ 21. It has also sent him reimbursement for his insurance premiums. Id. ¶ 23. In addition, the Third Addendum explicitly states that Major Adams is eligible to receive moving expenses and advises Major Adams that he should contact DFAS to obtain reimbursement for those expenses. AR at 562.

Further, there is no merit to Major Adams's argument that the AFBCMR should have directed that he receive reimbursement for medical expenses incurred for his back surgery and other procedures, because he would have received free medical care as a matter of right pursuant to 10 U.S.C. § 1074 had he been kept on active duty to undergo the medical evaluation process. That argument is foreclosed by the court of appeals' decision in Barnick v. United States, 591 F.3d 1372 (Fed. Cir. 2010). In that case, the court of appeals held that a service member who is voluntarily separated from the service cannot secure monetary relief based on a theory of constructive service where he claims that "he should have been retained on active duty merely for disability evaluation." Id. at 1379–80.

Moreover, 10 U.S.C. § 1552(c)(1) provides that "the Secretary concerned may pay, from applicable current appropriations, a claim for the loss of pay, allowances, compensation, emoluments, or other pecuniary benefits, or for the repayment of a fine or forfeiture, if, as a result of correcting a record under this section, the amount is found to be due the claimant on account of his or another's [military] service." Thus, in light of the Board's correction of Major Adams's record to reflect a disability retirement in May 2006, he was entitled to receive the "pay, allowances, compensation, emoluments, or other pecuniary benefits" that he would have received had he been medically retired on that date. But because "the availability of medical care for retired personnel of the uniformed services is discretionary with the services, retired personnel who fail to receive such care cannot successfully maintain an action for money damages based on such failure." Lord v. United States, 2 Cl. Ct. 749, 757 (1983) (citing 10 U.S.C. § 1074(b)).

Similarly, with respect to Major Adams's claims for reimbursement of medical expenses, TRICARE has advised him that he is entitled to coverage under its health care and dental programs as a result of the corrections made to his record. AR at 545, 556. As such, the

AFBCMR properly found that the corrections made, including "granting [Major Adams] a medical retirement with TRICARE eligibility[,] constitute[d] full and fitting relief." AR at 504. To the extent that Major Adams believes that he has been wrongfully denied benefits by TRICARE, his resort is not to the AFBCMR—it is to the administrative scheme set forth in DoD regulations for challenging TRICARE coverage determinations. See 32 C.F.R. § 199.10.

For these reasons, the Board's decision that it provided Major Adams with all the relief it is authorized to provide was neither arbitrary and capricious, an abuse of discretion, nor unsupported by substantial evidence on the whole record.[6]

## CONCLUSION

For the reasons discussed above, the government's motion for judgment on the administrative record is **GRANTED** and Plaintiff's motion for judgment on the administrative record is **DENIED**. The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

s/Elaine D. Kaplan
ELAINE D. KAPLAN
Judge, U.S. Court of Federal Claims

---

[6] Plaintiff requests that the Court issue a judgment for the amount of back retired pay and moving expenses due to him. Pl.'s Cross-Mot. at 42–43. But, as noted above, the government has already issued Major Adams checks for back pay, and counsel for the government indicated at the oral argument that DFAS would reissue those checks at Major Adams's request. Oral Arg. Tr. at 78. The status of Major Adams's request for reimbursement of moving expenses is unclear, but the government has acknowledged his entitlement to submit a claim for reimbursement for such expenses to DFAS. Def.'s Reply at 10 n.7, ECF No. 63. Until he does so, and until DFAS makes its determination, his claim for reimbursement is not ripe for review.